DISSENTING- OPINION.
KENNISH, J.
— 1 respectfully dissent from the opinion of the court and the concurring opinion delivered in this case. In stating the reasons therefor, I shall avoid a discussion of the great educational and religious work and influence for good of the respondent, on the one hand, as well as on the other, the fact that respondent is now seeking a construction of a law which would give to it an immunity from the burdens of taxation denied to every other similar institution in this State founded since the year 1865. These are matters aside from the question directly presented for decision in the case.
The taxes sought to be collected in this suit are taxes on respondent’s personal property. Its lands are conceded to be exempt from taxation. The sole question for consideration is whether the Legislature of this State, by the Act of 1851, which exempted respondent’s lands from taxation, in speaking of “land and improvements thereon,” “lands in the counties *324 of Mercer and Sullivan” returned delinquent for the non-payment of taxes, lands on which it was made punishable to cut timber, and “all the lands that may be hereafter granted to said college,” intended to include within the meaning of the word “lands,” so used, moneys, notes, bonds or any other form of personal property. And in the determination of this question we are to be governed, under the rules of law, by what the Legislature did in fact say, and not by what the court would have said under the circumstances, had it, instead of the Legislature, been making the law.
The Act of 1851, to be construed, is set out at length in the opinion of the court and need not be reproduced here. It appears from this act that in the year 1851 respondent, incorporated two years before, owned lands in Clay, Grundy, Mercer and Sullivan counties in this State, in the latter two of which taxes on its lands were then delinquent, and that by the provisions of said act respondent was granted an acquittance from such taxes.
The following references to this act appear in the House Journal of the Sixteenth General Assembly, 1850, namely, at page 231 of the appendix:

“Report of the Committee on Education upon the Petition of the Trustees of William Jewell College, Accompanied by Bill for Relief of said College.

“The committee on education, to whom was referred the petition of the trustees of William Jewell College praying that lands belonging to said college may be exempted from taxation and protected from trespasses, have had the same under consideration and beg leave to
“report.
“That it appears that said college, besides the lands donated to them adjoining the town of Liberty, *325 for a college location, they have had donated to them, for the canse of education, about four thousand acres of land in the counties of Grundy, Mercer and Sullivan,. and your committee believe that these lands, and all others that may be donated for the cause of educations, should be exempted from taxation so long as such lands may. be owned by said college, they therefore recommend the passage of the accompanying bill.
“McPherson, Chairman.”
And at page 323, is the following:
“Mr. McPherson, from the same .committee, to which were referred the petition of the trustees of William Jewell College, asking exemption from taxation of college lands, reported by bill entitled,
“An act for the benefit of William Jewell College;
“Which was read a first time, rule suspended, read a second time;
“When Mr. Clark offered the following amendment;
“Amend by way of rider as follows:
“In section 1, after the words, ‘to said college,’ insert ‘ or to any other institution • of learning in this State;’
“Which was read a first time, rule suspended, read a second time;
“When the bill as amended was read a third time and passed.”
Prom the foregoing sidelight thrown on this legislation, together with the record in this case, it is disclosed that the “Act for the Benefit of William Jewell College” was introduced and passed by the General Assembly of this State in response to a petition “for the relief of said college,” presented by the trustees thereof; that respondent had no personal property at the time of the passage of said act. And the conspicuous absence of another fact also appears, which should not be overlooked, in view of the emphasis given to and *326 the inference sought to he drawn from the failure or omission of the taxing authorities to tax the property of the respondent “for over fifty years.” Although the financial officers of respondent testified in the case, and although the evidence was undoubtedly available, it is not shown anywhere in the record when, after 1851, respondent did first own personal property. It is obvious that if respondent did not own personal property until long after the exemption of its lands from taxes by said act, so that its name would not appear upon the tax books, even if its personal property were conceded to be taxable, then the continued omission of such officers to tax respondent, after the,acquisition of personal property, is of little or no significance, as showing the contemporaneous construction of the Act .of 1851.
I shall not enter upon a discussion of the rules of construction and interpretation of laws, which may be invoked in a proper case to ascertain the legislative intent, and for the evident reason that resort to such rules is permissible only when the language used is susceptible of different meanings, or is ambiguous, and therefore supplies the necessary doubt as a basis for construction. When the Legislature has used plain, ordinary words, of well recognized meaning, as in the act before us, there is nothing left for construction, and it is not the province of the court to go outside of the act itself and resort to extrinsic facts and circumstances, in order that immunity from taxation may be extended to a class of property not exempted by the language of -the act. •
This well established principle of law is given expression in Lewis’s Sutherland on Statutory Construction (2 Ed.), vol. 2, sees. 366 and 367, as follows: “The certainty of the law is next in importance to its justice. And if the Legislature has expressed its intention in the law itself, with certainty, it is not admissible to depart from that intention on any extraneous *327 consideration or theory of construction. ‘It is beyond question the duty of courts in construing statutes to give effect to the intent of the lawmaking power, and seek for that intent in every legitimate way. But . . . first of all in the words and language employed; and if the words are free from ambiguity and doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation.’ The statute itself furnishes the best means of its own exposition; and if the sense in which words were intended to be used can be clearly ascertained from its parts and provisions,' the intention thus indicated will prevail without resorting to other means of aiding in the construction.”
It is not questioned that, as stated in the opinion in this case, “the cardinal rule of construction is that which requires the legislative intent to be ascertained and to this all other rules are subservient,” but it is equally cardinal that, “this intention, however, must be the intention as expresséd in the statute, and where the meaning of the language is plain it must be given effect by the courts or they would be assuming legislative authority.” [36 Cyc. 1106.]
In the charter granted by the Legislature to respondent, apt words were employed, conferring upon the trustees of the respondent the power “to hold by gift, grant, demise, devise or otherwise, any lands, tenements, hereditaments, moneys, rents, goods or chattels of what kind soever the same may be,” and in other acts of the General Assembly which passed the Act of 1851, charters were granted similarly giving power to acquire and own lands and personal property, showing clearly that when the Legislature intended so doing it did make use of the words “lands” and “personal property,” in their plain,, usual and ordinary sense. This fact, which under all rules of discur *328 sive controversy, would be a persuasive reason for holding that the word “land” was used and the words “personal property” omitted intentionally in the act before us, strangely enough, is seized upon by respondent and urged as a circumstance in support of the opposite contention that personal • property was intended to be included within the meaning of the word land.
But the strength of the State’s case does not rest alone in its insistence upon the use of the word ‘ lands ’ ’ in the plain and ordinary sense as usually understood. It-goes further and urges in support of its position the language and provisions of the law.
It surely cannot be maintained that the words “lands and improvements thereon,” in the first section, and the words “lands belonging to said college in the counties of Mercer and Sullivan,” in the second section, and the lands referred to in the third section, on which it is made an offense to cut or remove timber, were intented to include “ moneys, rents, goods or chattels,” and no valid reason can be given why the word was used in any different sense in the clause “and all lands that may be hereafter granted or devised to said college,” in the first section. Indeed, the strongest confirmation that the words last quoted were used in the same sense as in the other provisions of the act, is found in the fact that the report of the committee, who had before them the petition of the trustees, speaks of respondent's “about four thousand acres of land, situate in the counties of Grundy, Mercer and Sullivan, and your committee believe that those lands and all others that may be donated for the cause of education,” etc. Can it be doubted that the words “and all others,” as thus used, meant all other lands such as were owned in the counties named and such as had “improvements thereon,” and on which persons were forbidden to cut timber? Can it be maintained that the Legislature exempted personal property by the use of the words “ lands and *329 improvements thereon,” or that it intended to penalize the cutting of timber on “moneys, rents, goods and chattels?”
It is stated in the concurring opinion herein that there may be a question as to the exemption from taxes, under the provisions of said act, of lands acquired by respondent since the adoption, of the Constitution of 1875. As the taxes in controversy are on personaL property which may have come to respondent since that date, for aught that appears to the contrary, then we have the possibility suggested of a construction by this court of an act purporting to exempt land from taxes which would leave lands subject to taxation, while at the samé time exempting personal property.
It is shown by the entries above cited from the House Journal, and by the act itself, that respondent owned lands upon which taxes were due and delinquent and as to the legality of which no question was raised; that respondent appealed to the Legislature of this State, through the petition of its trustees, asking relief from the payment of its taxes and exemption of its lands from taxation in the future. That the' Legislature generously granted the petition and an acquittance from the taxes. Now respondent comes into court and says that because it “accepted” this bounty which it petitioned for, a consideration moved from it to the State which made the act of the State and.respondent’s acceptance a contract under which respondent is entitled to assert rights as against the State, its benefactor iu this transaction.
On the other hand appellant maintains that the Act of 1851, being a mere immunity and privilege, not based upon any valid consideration, did not constitute a contract by which vested rights aro,se and, therefore, that it was subject to repeal at will and was repealed by later inconsistent constitutional and statutory provisions.
*330 Appellant’s position upon this point is founded oh reason and is not without authority to support it, hut my confidence in the correctness of the ground upon which this dissent is already based is such that I am not disposed to look for other reasons and, therefore, do not pass upon this contention.
There are few words of more frequent use in the laws Of this State than the word “lands” and few in use in common speech in which the meaning is so well understood.
It is defined by section 8057, Revised Statutes of 1909, as 'follows: ‘ ‘ The terms ‘real property ’ or ‘ premises,’ or ‘real estate’ or ‘lands,’ shall be deemed to be coextensive with lands, tenements and hereditaments.” By the same section the words “personal property” and ‘ ‘ property ’ ’ are defined as follows: ‘ ‘ The words ‘personal property’ shall include money, goods, chattels, things in action, and evidences of debt. The word ‘property’ shall include real and personal property.”
In the laws of this State in force at the time of the passage of the act before us the word “lands” is found used in the same sense as thus defined and as contended for by the appellants, in many instances, and no case has been found or called to our attention in which it is used in the sense of including personal property. The sense in which it is thus used in the law is identical with the meaning given to it in ordinary speech and as generally understood. In my opinion the word was used in that sense in the Act of 1851 and, if so, the taxes were legal and the judgment should be reversed.
Vallicmt, G. Jand Ferriss, J., concur in this opinion.